**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **CRAIG D. PERCIAVALLE, JOSEPH A. RUNKEL, and WILLIAM O. ADAMS,** <br><br>     **Defendants.** | **Civil Action No. 23-cv-00109** |

## COMPLAINT AND JURY DEMAND

Plaintiff, United States Securities and Exchange Commission ("SEC"), alleges as follows against Defendants Craig D. Perciavalle, Joseph A. Runkel, and William O. Adams (collectively, "Defendants").

## I.       INTRODUCTION

1.       From at least January 2013 through at least July 2016 (the "Relevant Period"), Defendants engaged in a deceptive scheme to fraudulently overstate revenues and earnings before interest and tax ("EBIT"). Defendants for Austal USA, LLC ("AUSA"), a wholly owned United States subsidiary of Austal Limited ("Austal"), an Australian defense contractor. Perciavalle was AUSA's former president and Adams was the former director AUSA's two shipbuilding programs. Runkel is AUSA's current director of financial analysis. Defendants orchestrated the fraud in order to meet or exceed analyst consensus estimates for EBIT, a key financial metric used by analysts and investors.

2.      Defendants' misconduct involved using artificially low estimates at completion ("EAC") for ships Austal built for the United States Navy ("Navy"). This misconduct allowed them to reduce the EACs by tens of millions of dollars for certain ships that AUSA built for the Navy. The artificially low EACs caused AUSA to report inflated revenue and EBIT to Austal. In turn, Austal publicly reported overstated revenue and EBIT in its filings that were available to United States investors.

3.      Defendants carried out the scheme by improperly reducing estimated costs from the EACs. In particular, Defendants instructed AUSA personnel responsible for calculating the EACs to arbitrarily lower them to meet AUSA's budgets (and, in turn, increase revenue from period to period). Additionally, Defendants attempted to conceal the fraud by lying to AUSA's auditors.

4.      As a result of the deceptive scheme, by no later than the financial period ended December 31, 2013 (reported on February 27, 2014) through at least the financial period ended June 30, 2015 (reported on August 26, 2015), Austal prematurely recognized revenue and met or exceeded analyst consensus estimates for EBIT.

5.      During the time period of these false financial filings, Austal's stock price (as represented in Australian dollars ("AUD")) increased in value – going from approximately 0.88 AUD per share during late February 2014 to approximately 2.40 AUD per share by late November 2015.

6.      By engaging in this deceptive conduct, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Exchange Act Rules 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) and (c). In addition, Defendants aided and abetted Austal's misconduct by knowingly or severely recklessly providing substantial assistance

to Austal's violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5 thereunder, and AUSA's violations of Section 10(b) of the Exchange Act and Exchange Act Rules 10b-5(a) and (c) thereunder. Unless restrained and enjoined, Defendants will continue to violate the federal securities laws.

## II.    DEFENDANTS

7.    **Craig Perciavalle** is 52 years old and resides in Mobile, Alabama. Perciavalle served as AUSA's president from December 13, 2012, until his resignation on February 22, 2021. As president of AUSA, Perciavalle exercised control over the management, general operations, and policies of AUSA, as well as the conduct which violated the securities laws. He is currently employed as a vice president and general manager at the U.S. subsidiary of a European public shipbuilding company. Perciavalle invoked the Fifth Amendment privilege against self-incrimination in testimony concerning the facts at issue in this Complaint. Perciavalle entered into tolling agreements with the SEC, tolling the statute of limitations from July 1, 2019 through February 28, 2023.

8.    **Joseph Runkel** is 54 years old and resides in Mobile, Alabama. Runkel has served as AUSA's director of financial analysis since 2009. Runkel invoked the Fifth Amendment privilege against self-incrimination in testimony concerning the facts at issue in this Complaint. Runkel entered into tolling agreements with the SEC, tolling the statute of limitations from July 1, 2019 through February 28, 2023.

9.    **William Adams** is 63 years old and resides in Mobile, Alabama. Adams served as director of AUSA's Littoral Combat Ships ("LCS") program from 2010 through approximately July 2015, and then as director of AUSA's Joint High Speed Vessels ("JHSV") program. Adams left AUSA in January 2021. Adams is currently employed at a company that provides electrical components and support for shipbuilders. Adams invoked the Fifth

3

Amendment privilege against self-incrimination in testimony concerning the facts at issue in this Complaint. Adams entered into tolling agreements with the SEC, tolling the statute of limitations from January 12, 2021 through February 28, 2023.

### III.   JURISDICTION AND VENUE

10.     The SEC brings this action, and the Court has jurisdiction over this action, pursuant to Exchange Act Sections 21(d)(1) (action for injunction in district court), 21(d)(3)(A) (action for penalty and disgorgement in district court), 21(d)(5) (action for equitable relief—disgorgement—in district court), 21(d)(7) (action for disgorgement in district court), 21(e) (action for injunction in district court), and 27(a) (district court's jurisdiction), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(d)(5), 78u(e), and 78aa(a).

11.     The SEC seeks: permanent injunctions under Sections 21(d) and (e) of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e); disgorgement of ill-gotten gains derived from the conduct alleged in the Complaint, plus prejudgment interest thereon, under Section 21(d)(5) and 21(d)(7) of the Exchange Act, 15 U.S.C. §§ 78u(d)(5) and (7); civil penalties under Section 20(d) of the Exchange Act, 15 U.S.C. § 78u(d); and officer and director bars under Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2). The SEC also seeks any other relief the Court may deem appropriate.

12.     The Court has personal jurisdiction over Defendants, and venue is proper in the Southern District of Alabama, pursuant to Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa, because many of the acts and transactions constituting violations of the Exchange Act occurred in this district. In addition, Defendants reside in this district, AUSA had its principal place of business in this district at the time of the conduct alleged, and one or more investors reside in this district.

13.     In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means and instruments of transportation or communication in interstate commerce, or the mails, including emails and telephone calls between Defendants and Austal executives in Australia, AUSA's transmission of its management accounts via email to Austal, and Austal's publication of its reports, presentations, and press releases on its website in Australia.

## IV.     FACTUAL BACKGROUND

### A.     Austal and AUSA's Business

14.     Austal is a global defense prime contractor and a designer and manufacturer of defense and commercial ships. It is an Australian corporation with its principal place of business in Henderson, Australia. Its common stock ("Ordinary Shares") trades in Australian dollars on the Australian Securities Exchange ("ASX").

15.     Austal trades Level 1 sponsored American Depository Shares ("ADRs") on the American over-the-counter ("OTC") market under the symbol AUTLY. An ADR is a negotiable certificate issued by a U.S. depository bank representing a specified number of shares of a foreign company stock. Bank of New York Mellon issued the Austal ADRs. An Austal ADR is equivalent to ten shares of Austal stock trading on the ASX. Austal's Ordinary Shares trading on the ASX also trade on the American OTC market under the symbol AUTLF.

16.     Austal's ADRs, its Ordinary Shares trading on the ASX, and its Ordinary Shares trading on the American OTC are securities within the meaning of Section 3(a)(10) of the Exchange Act, which defines a "security" to include, among other things, "any…stock."

17.     Austal's fiscal year runs from July 1 to June 30, and it files half-year and fiscal year annual reports and press releases with the ASX, and posts those same reports, financial

statements, and press releases on its website (www.austal.com). Austal's website is available for viewing by U.S. investors. A page on the Austal website entitled "U.S. Investors-ADR Program" provides information on Austal's ADR program.

18.    Analysts who followed Austal's stock compiled reports about its key financial metrics, including EBIT. EBIT is a proxy for earnings and analysts and investors use it to assess the performance of a company's core operations without the costs of the capital structure and tax expenses affecting profit. Austal's targeted EBIT was also important to Austal and AUSA. As further explained below, Austal directed that AUSA meet certain targets for EBIT, and Austal often touted the EBIT it achieved in its press releases.

19.    Austal prepared its financial statements in accordance with Australian Accounting Standards ("AAS"), and complied with International Financial Reporting Standards ("IFRS"). These accounting standards required Austal to use the "latest available, reliable information" to calculate the EACs. *See* International Accounting Standard ("IAS") 8.32. Austal's reports and financial statements, which Austal published on its website, represent that Austal's financials are prepared in accordance with AAS and comply with IFRS.

20.    AUSA is an Alabama limited liability company, located in Mobile, Alabama, and is wholly owned by Austal. During the Relevant Period, AUSA was governed by its own Board of Managers, consisting of Austal's chairman, Austal's former chief executive officer ("CEO"), Perciavalle (in his role as AUSA's president), AUSA's former chief financial officer ("CFO") (who is deceased), and three outside managers. AUSA also prepared its financial statements to comply with IFRS.

21.     During the Relevant Period, AUSA's financials were reported as part of Austal's, both as part of Austal's consolidated financials and separately in a discussion of AUSA's operations. They also appeared in Austal's half-year and annual reports.

22.     During the Relevant Period, AUSA generated more than 75% of Austal's revenue. AUSA generated this revenue largely from AUSA's shipbuilding contracts with the Navy.

**B.     Defendants' Responsibilities at AUSA**

23.     During the Relevant Period, as AUSA president, Perciavalle ran and was ultimately responsible for all aspects of AUSA, including AUSA's shipbuilding and AUSA's financials. Perciavalle was the top AUSA executive, and all other AUSA executives reported to him, including the former AUSA CFO.

24.     During the Relevant Period, as AUSA's director of financial analysis, Runkel was part of AUSA's Finance Department and reported to the former AUSA CFO. Runkel received EAC data from AUSA's cost account managers who calculated the EACs, and was then responsible for finalizing the EACs that were used for AUSA's financials. Runkel also handled AUSA's budgeting, forecasting, and other financial data analysis. Runkel had the added responsibility of overseeing AUSA's Earned Value Management System ("EVMS"), the system AUSA used for measuring project performance and progress. The Navy required AUSA to use EVMS to report its progress on the shipbuilding contracts to the Navy.

25.     During the beginning of the Relevant Period, Adams was Director of the LCS program, the AUSA shipbuilding program in which AUSA manipulated EACs. As the director of the LCS program, Adams ran and was responsible for all aspects of construction of the ships within the program. Adams was director of the LCS program until approximately July 2015, when he became the director of the other AUSA shipbuilding program, the JHSV program.

Adams' involvement in the LCS program continued into at least early 2016, as he transitioned the incoming LCS director into his former role. As director of both the LCS and JHSV programs, Adams reported to Perciavalle.

### C.    Austal's Navy Contracts and Revenue Recognition

26.    During the Relevant Period, AUSA served as the prime contractor on Navy contracts to build the ships for the LCS and JHSV programs, and built both ships at its Mobile, Alabama shipyard. LCS ships are 418-foot aluminum combat ships. JHSV ships are 338-foot steel transport vessels.

27.    In December 2010, the Navy awarded Austal contracts to build LCS ships as the prime contractor. The ships are numbered using only even numbers. During the Relevant Period, AUSA built and reported on eleven ships, LCS 6 through 26. AUSA continues to build these ships for the Navy.

28.    During the Relevant Period, Austal and AUSA used EACs as part of a formula to recognize revenue. The EAC for each ship is the estimate of total costs for the completed ship. EACs consist of material costs (such as the cost of aluminum and steel), labor costs (such as the cost to pay employees and contractors) and overhead expenses already incurred, plus estimated future material, labor, and overhead costs to complete the ship. Each ship had its own EAC during construction and the EACs for the ships in progress were combined to generate an overall EAC.

29.    The total revenue Austal received for each ship was based on the Navy contract, and Austal recognized that revenue period by period based on progress towards completion, with Austal recognizing the full amount on completion. Progress was determined by measuring expenses actually incurred to date compared to the EAC for the ship. As the material, labor, and

overhead costs were actually incurred, a lower EAC number caused Austal to show greater progress towards completion and, as a result, recognize more revenue during that period.

30.     AUSA calculated monthly financial numbers, including revenue and profit, which it reported to Austal monthly in spreadsheets called "Management Accounts." Austal incorporated the financial data in the Management Accounts into Austal's half-year and annual reports.

31.     In addition to its public financial reporting, AUSA's Navy contracts required AUSA to submit certain monthly reporting to the Navy on the status of each ship's progress through the EVMS. These monthly reports, called "Contract Performance Reports" ("CPRs"), were prepared by AUSA personnel supervised by Runkel and included a latest revised estimate EAC (hereinafter, the "Navy EACs").

### D.     Austal's Budgeted Revenue and EBIT

32.     Austal had an annual budgeting process and it budgeted AUSA to generate certain amounts of revenue and EBIT for each reporting period. By at least the beginning of, and continuing throughout the Relevant Period, Austal pressured AUSA to meet its budgeted revenue and EBIT. For example, on or about February 27, 2013, Austal's former CEO emailed Perciavalle in response to an email informing Austal that AUSA's EBIT and revenue were less than the budget for the month. Austal's former CEO scolded Perciavalle about AUSA's "under budget performance," urged him to "hit the quarter and year end budget numbers," and warned him that "investors . . . expect us to keep our promise . . . and will not tolerate under delivery." Perciavalle responded: "I fully understand the importance in meeting our commitments and will continue to drive toward that end."

33.     Similarly, on or about January 9, 2015, Perciavalle texted the former AUSA CFO a copy of certain AUSA EBIT targets that Austal's former CEO had given Perciavalle for half-

year 2015 and fiscal year 2015. Perciavalle sent these target numbers to former AUSA CFO with direction to meet these targets. Perciavalle and the former AUSA CFO continued to text each other and discussed how to manipulate the EACs to meet the target EBIT numbers.

34.     The manipulation was successful as AUSA's final EBIT for half-year and fiscal year 2015 exceeded AUSA's EBIT listed in Perciavalle's text.

**E.     Defendants Knew AUSA Could Not Achieve Austal's Financial Targets.**

35.     During the Relevant Period, Defendants knew, or were severely reckless in not knowing, that AUSA could not achieve Austal's financial targets. AUSA's initial LCS bid did not sufficiently account for rising costs, change orders, or other issues that contributed to cost overruns. AUSA's budgeted revenue and EBIT for period to period, however, was based on the LCS bid costs, and so the rising costs of building the LCS meant that AUSA was not meeting its budgeted revenue and EBIT.

36.     During the build of LCS 6, and at the latest by December 2013, it was clear to Perciavalle, Runkel, and Adams that it would be impossible to meet Austal's demands to generate enough revenue in a reporting period to achieve the targeted EBIT. This was because AUSA's actual costs to build LCS 6 far exceeded AUSA's budgeted costs in its Navy bid.

37.     Perciavalle received detailed information, including in weekly LCS meetings, from Runkel, Adams, and others, which showed that the estimated material and labor costs exceeded the costs on which AUSA had based its bid for the LCS contract.

38.     Additionally, Defendants saw detailed information showing that the cost to build each new LCS ship was rising. For example, AUSA had to purchase over twice the amount of aluminum sheets for each LCS ship than initially budgeted because it underestimated the amount aluminum sheets each LCS ship would require.

39.     AUSA's labor costs were also higher than the labor bid costs and were rising with each LCS ship. For example, it was difficult to find welders with experience welding aluminum, so instead of hiring welders who could immediately start doing the job necessary to complete the ships, AUSA spent labor hours teaching those workers aluminum welding. Also, AUSA struggled to hire and retain the skilled labor needed to build the ships.

**F.     Defendants' Deceptive Conduct Caused Austal to Prematurely Recognize Revenue.**

**1.     Manipulation of Material EACs**

40.     AUSA and Defendants manipulated the LCS EACs related to material costs by failing to include all the estimated cost growth in the EACs.

41.      AUSA and Defendants calculated the LCS material EACs based on: (a) actual costs of material already purchased; and (b) estimated costs of material to be purchased to complete the LCS. One of the AUSA LCS material manager's ("Material Manager") duties was to calculate the EACs.

**a.     The Material Manager Documented Defendants' Demands to Falsify the EACs.**

42.     At various times during the Relevant Period, Runkel and Adams instructed the Material Manager to falsely reduce the LCS material EACs below the true costs. The Material Manager wanted AUSA to recognize the actual cost growth and to use the EACs she calculated, which she wanted to base on the "latest available, reliable information." Instead, Adams and Runkel provided AUSA's Material Manager with manufactured EACs and directed her to use the manipulated numbers to reach Austal's financial targets. Runkel and Adams provided the manipulated EAC numbers to the Material Manager using disposable sticky notes to conceal the fraud and make sure it was untraceable in AUSA's electronic or physical records.

43.     The Material Manager resisted these directives to falsely reduce the LCS material EACs below the true costs by, among other things, discussing her opposition with Runkel and Adams, and questioning the use of phony EACs.

44.     On or about January 10, 2013, the Material Manager wrote in an email to herself that Runkel and the former AUSA CFO instructed her to lower the EACs that she had calculated. The Material Manager's memo stated: "My numbers were good but Runkle [sp] said lower [the Estimate to Completion] . . . ." The Estimate to Completion ("ETC") is the estimated amount of future expenses needed to complete the ship. This amount is added to costs already incurred to calculate the EAC.

### b.     Defendants Used Phony "Challenges" to Hide Cost Growth.

45.     During the Relevant Period, both Perciavalle and the former AUSA CFO told Runkel and Adams that AUSA was not going to include all the estimated material cost growth in the EACs.

46.     In order to conceal the true estimated cost growth of the materials, Perciavalle instructed various AUSA personnel, including Runkel and Adams, to improperly reduce the EACs, terming these reductions "management challenges" or "program challenges." Defendants designed these "challenges" to appear as legitimate ways to reduce the LCS material costs.

47.     In reality, however, these so-called "challenges" were equal to the amount of LCS estimated cost growth that Defendants did not want to include in that financial period's EAC. The amount of "challenges" increased over time so that almost none of the additional estimated cost growth was included in the EACs.

48.     For example, on or about April 18, 2013, the Material Manager emailed herself to document that Adams instructed her to manipulate the LCS EACs through a "challenge" process. She wrote "[t]oday we were asked by [Adams] to modify the LCS EAC's… I explained to

[Adams] that he needed to give me reasons for the reductions and I did not want to modify the values to meet a number." She further described that Adams "said he will take challenges such as material returns . . . to make up the deltas" and explained that she "needed the board numbers to know what numbers [she] had to hit."

49.    Under the applicable international accounting standard, Defendants must prepare, but failed to do so, EACs based on the "latest available, reliable information." *See* IAS 8.32.

50.    Nonetheless, Perciavalle's "management challenges" – that Runkel and Adams implemented – were unsupported and not tied to specific, realistic, or achievable costs of the materials required to build each LCS. Rather, the "challenges" were the estimated cost growth that Perciavalle, Adams, and Runkel did not want to include in the EACs sent to Austal.

51.    For example, on or about July 5, 2013, the Material Manager sent an email to a colleague that "[Perciavalle] wants all growth moved to challenges as an offset." This directive was not tied to any true, actual, or realistic reduction.

52.    Although the Material Manager and other LCS program personnel told Perciavalle and Adams the challenges were unrealistic, Perciavalle directed the Material Manager to continue to apply the challenges to the total material EACs that were reported to Austal.

53.    In the spring of 2016, when the Materials Manager would complain, Adams told the Material Manager that if she wanted to keep her job, she should not to discuss the management challenges with the Austal CFO.

54.    The Material Manager reduced the EAC calculations as instructed, but also maintained a spreadsheet to memorialize the material EACs she calculated as compared to the artificially reduced material EACs that AUSA reported to Austal.

    **c.**  **Defendants Attended Weekly Meetings to Discuss the Phony "Challenges"**

55. On every Friday throughout the Relevant Period, AUSA had weekly LCS Executive Review Meetings, multi-hour meetings attended by AUSA personnel involved in all aspects of the LCS shipbuilding process, who presented on the status of each LCS under construction. Perciavalle led these weekly LCS Executive Review Meetings; Adams always attended until approximately June or July 2015 when he transferred to the JHSV program; and Runkel attended at least some of these meetings. These meetings included weekly PowerPoint presentations containing slides with the monthly material EACs, and documented both the Material Manager's LCS EACs as well as the challenges applied to lower them.

56. For example, the August 2, 2013 Executive Review Meeting featured a chart showing the material EAC for LCS 6 for June 2013. After costs increased by at least $2 million, the chart listed a "Program Challenge," showing a $2 million reduction from the material EACs for LCS 6. This "Program Challenge," however, was not tied to any specific reduction in cost and did not explain how the estimated material costs to finish the ship might be lowered by $2 million.

57. A year later, a similar slide presented at August 1, 2014 Executive Review Meeting included the LCS 6 material EACs for June 2014. The slide referred to a "Program Offset," rather than a Program Challenge, but contained the same type of information and functioned like the Program Challenge. Perciavalle directed the Material Manager, through an instruction to Adams, to delete the explicit reference to a "Program Challenge" in the slides to

conceal from others not involved in the EAC process that Defendants were applying an offset to arbitrarily lower the EACs.

58.     The weekly LCS Executive Review presentations throughout the Relevant Period demonstrate Defendants' knowledge that: (1) the estimated material costs to complete the LCS were increasing over time; and (2) the phony "challenges" did not lead to cost reductions (because, they were unsupported amounts Defendants used to justify lowering the EACs).

### 2.     Manipulation of Labor EACs

59.     AUSA's estimated labor costs to build a LCS ship were higher than the estimated labor costs that it used in the Navy bid. Instead of including these costs in the LCS labor EAC, AUSA and Defendants manipulated the labor hours (which hours were then converted to a labor cost EAC) to more closely align them with the amount used for AUSA's Navy bid.

### a.     Defendants Were Aware of the Rising Labor Costs.

60.     From approximately mid-2015 forward, Perciavalle was aware of the rising labor cost numbers because the new LCS program director met weekly with him to discuss the rising costs.

61.     Additionally, the Executive Review Meeting presentations referenced above (*see* ¶ 55)  – that Defendants usually attended – contained PowerPoint slides with the weekly labor hours data and labor EACs, showing: (1) that the labor EACs were much higher than the bid labor EACs and continuing to grow; and (2) a trend of increased labor hours as ships neared completion.

62.     January 2015 text messages between Perciavalle and the former AUSA CFO (*see* ¶¶ 33 and 78) also show that Defendants intentionally manipulated the labor EACs because they were too high. In those messages, Perciavalle asks the former AUSA CFO whether it easier to manipulate material or labor.

63.     These same text messages demonstrate that Perciavalle consulted with Adams and Runkel on how to manipulate the EACs.

**b.      Defendants Knew that Labor Costs Were Coming In Higher than the Navy Bid.**

64.     During the Relevant Period, AUSA used different methods to estimate the labor hours (and so labor EACs) to complete the LCS ships. These methods usually showed the labor hours necessary to build the ships in the LCS program were higher than the Navy bid. Nevertheless, Defendants continued to use either only the labor hours already incurred on the earlier ships (which they had to include in the LCS labor EACs) or, for the ships early in construction, the Navy bid labor EACs.

65.     Perciavalle was aware that the EACs differed depending on the calculation method. Indeed, Perciavalle instructed AUSA personnel to submit the higher labor EAC numbers to the Navy to support AUSA's shipbuilding schedule. Although Defendants received and analyzed this data, AUSA initially continued to base the LCS labor EACs on the hours that were included in the original LCS Navy bid.

**c.      Defendants Manipulated Labor EACs.**

66.     Later in the Relevant Period, in an attempt to estimate labor costs for the ships early in their construction cycle, Runkel applied a "learning curve" to the labor hours required to build subsequent LCS ships under the Navy contract. This "learning curve" method assumed that labor hours would significantly decrease on each subsequent ship. More specifically, Runkel's 90% "learning curve" assumed that the labor hours (and so EACs) of each subsequent LCS ship would be 90% of the labor costs for the LCS ship built before it ("90% Learning Curve"). In reality, the 90% Learning Curve was just another way that the Defendants tried to justify a reduction in the overall labor EACs to meet Austal's targets.

67.     Perciavalle and Runkel began using Runkel's estimated labor hours based on the 90% Learning Curve for the labor EACs. However, applying the 90% Learning Curve to ships early in construction resulted in labor hours that were completely inconsistent with the labor hours actually used to build the first few LCS ships.

68.     Further, the new LCS program director, who took over for Adams in approximately July 2015, told Perciavalle and Runkel that even using a 90% Learning Curve for labor hours would yield inaccurately low EACs.

69.     For example, on or about October 21, 2015, the new LCS program director emailed the LCS vice president that he had reported his estimates for labor hour EACs for LCS 8 through 24 to Runkel, and they were hundreds of thousands of labor hours above the 90% Learning Curve numbers, which AUSA used to calculate revenue and EBIT. In the email, the new LCS program director explained that using his accurate numbers was "ugly as it relates to EBIT." The LCS vice president responded: "[Perciavalle] just grabbed me after speaking to [Runkel]…[Perciavalle] not happy with the numbers and advised [Runkel to] stick with 90% as worst case."

70.     Several weeks later, on or about November 9, 2015, Runkel emailed Perciavalle and the former AUSA CFO a chart of the LCS labor hours, showing various calculations of the LCS labor hours for each LCS ship, including the 90% Learning Curve. This chart showed that for the nearly completed LCS 6 and 8, the incurred labor hours were far above the original Navy bid labor EACs. In fact, the cost of the incurred labor hours were already equal to the highest possible cost estimated by AUSA. Defendants intentionally ignored this information and continued to use labor EACs for subsequent ships that were far below the labor costs needed to build LCS 6 and 8, and far below the highest possible cost estimates.

G. **Defendants Hid the EAC Manipulation From AUSA's Auditor.**

71.     During the Relevant Period, Austal was audited by a global accounting firm in Perth, Australia. As part of that audit, the accounting firm's U.S. affiliate conducted yearly audits and half-year reviews of AUSA, and reported its findings and conclusions for each audit and review to the auditors in Perth. Further, the U.S. auditors also issued an opinion on AUSA's separate financial statements for fiscal years 2014 through 2016.

72.     Throughout the Relevant Period, Defendants did not disclose their EAC manipulation to AUSA's auditor and, in fact, took steps to hide it.

73.     First, in at least June 2014, as part of its 2014 audit of AUSA, the AUSA auditor asked AUSA to explain its EAC process. In response to this request, in or around July 11, 2014, Defendants and others met to prepare an explanation. Rather than disclose how they manipulated the LCS EACs to meet EBIT targets, Defendants deliberately chose not to discuss the EAC process using an LCS ship. Instead, the Defendants explained the EAC process using a JHSV ship because AUSA was not applying the "management challenges" to the JHSV EACs. At the July 2014 meeting with the auditors, Adams and Runkel, only presented a JHSV PowerPoint to the auditors and concealed AUSA's use of a "management challenge" in the calculation of the LCS EACs.

74.     Second, for at least every annual audit conducted by AUSA's auditors during the Relevant Period, Runkel and Adams completed written questionnaires about the LCS program that did not disclose AUSA's use of management challenges and reported false EACs. Runkel and Adams also met in person with AUSA's auditors for every half-year review and annual audit to discuss the LCS EACs, and similarly failed to disclose management challenges or that Austal was using false EACs.

18

75.     Third, AUSA started in approximately December 2012 using EAC "sign-off" sheets reflecting the EACs that AUSA used to calculate its revenue and gross profit in its financial statements. AUSA used these sign-off sheets to show its auditor that its EACs were legitimate. There were sign-off sheets for both material EACs and labor hours. Each sign-off sheet listed a specific EAC and included a signature line for each LCS ship under construction. Some of the project managers (who supervised the building of one LCS ship) initially added disclaimer notes highlighting cost growth that was omitted from the EACs. AUSA senior management, including Adams, stopped this practice by ordering the project managers not to include the notes explaining that potential cost growth was not included in the EACs. The clean "sign-off" sheets (without disclaimers or notes) effectively concealed from the auditors the fraudulently low EACs.

76.     During the Relevant Period, Adams knew that some of the project managers were uncomfortable with signing the sign-off sheets because the EAC numbers were inaccurate. Rather than forcing these project managers to sign them anyway, Adams sometimes signed the LCS sign-off sheet.

77.     In approximately January 2016, Adams signed the LCS labor hours EAC sign-off sheet for the December 31, 2015 EACs. At the time Adams signed this sign-off sheet, he was no longer the LCS director. This sign-off sheet documented the phony labor EACs that AUSA used to calculate its half-year 2016 financials. Adams concealed from the AUSA auditors that project managers did not want to sign the sign-off sheets.

78.     Perciavalle discussed his intent to deceive the auditors with the former AUSA CFO. In the January 2015 text messages between Perciavalle and the former AUSA CFO (*see* ¶¶ 33 and 62), the former AUSA CFO stated "[AUSA's auditor] is going to take some

19

convincing…started with the easier stuff to defend and they'll want to understand the math" of

the EAC changes AUSA was making, and Perciavalle responded: "I will definitely defer to you

on how best to sell to them." Perciavalle further suggested trying to keep various EAC changes

"mutually exclusive otherwise it will raise the flag higher." The former AUSA CFO also

referenced Adams' involvement with AUSA's auditor, stating that they needed to discuss with

Adams first because AUSA's auditor "may well want a call with [Adams] to validate."

79.     Finally, Perciavalle signed management representation letters sent to AUSA's

auditors in which he made numerous false representations. In the management representation

letters for the audit of AUSA's Management Accounts for fiscal year 2014 (dated August 15,

2014) and fiscal year 2015 (dated on or about August 24, 2015), Perciavalle falsely represented

that: (1) AUSA had fulfilled its responsibilities for preparation of and fair presentation of the

financial statements in conformity with IAS and Austal accounting policies; (2) there were no

material transactions that were not properly recorded in AUSA's accounting records; (3) the

significant assumptions used by AUSA in making accounting estimates were reasonable and

supportable; (4) AUSA properly recognized vessel construction revenue using the percentage of

completion method; (5) all contract-related estimates represented management's best estimate;

and (6) he had no knowledge of any fraud or suspected fraud involving management or other

employees with a significant role in AUSA's financial reporting.

80.     In the management representation letters for the interim review of AUSA's

Management Accounts for half-year 2014 (dated February 18, 2014) and half-year 2015 (dated

February 25, 2015), Perciavalle falsely represented that: (1) AUSA had fulfilled its

responsibilities for preparation of and fair presentation of the financial statements in conformity

with IAS and Austal accounting policies; (2) he had no knowledge of any fraud or suspected

fraud involving management or other employees with a significant role in AUSA's internal controls or in which the fraud could have a material effect on AUSA's Management Accounts; and (3) the significant assumptions used by AUSA in making accounting estimates were reasonable and supportable.

81.     In the management representation letter for the interim review of AUSA's Management Accounts for half-year 2016 (dated February 19, 2016), Perciavalle falsely represented that: (1) AUSA had fulfilled its responsibilities for preparation of and fair presentation of the financial statements in conformity with IFRS and Austal accounting policies; (2) he had no knowledge of any fraud or suspected fraud involving management or other employees with a significant role in AUSA's internal controls or in which the fraud could have a material effect on AUSA's Management Accounts; (3) the significant assumptions used by AUSA in making accounting estimates were reasonable and supportable; (4) there were no material transactions that were not properly recorded in AUSA's accounting records; (5) AUSA properly recognized vessel construction revenue using the percentage of completion method; and (6) all contract-related estimates represented management's best estimate.

82.     In the management representation letter for the audit of AUSA's financial statements for fiscal year 2015 (dated September 8, 2015), Perciavalle falsely represented that: (1) AUSA had fulfilled its responsibilities for preparation of and fair presentation of the financial statements in conformity with IAS; (2) there were no material transactions that were not properly recorded in AUSA's accounting records; (3) the significant assumptions used by AUSA in making accounting estimates were reasonable and supportable; (4) AUSA properly recognized vessel construction revenue using the percentage of completion method; (5) all contract-related estimates represented management's best estimate; and (6) he had no knowledge of any fraud or

suspected fraud involving management or other employees with a significant role in AUSA's internal controls or in which the fraud could have a material effect on AUSA's financial statements.

**H.   Due to Defendants' Deceptive Conduct, Austal Made False Filings, Press Releases, and Investor Presentations.**

83.    Defendants and AUSA reported their financials to Austal. Austal reported its financials on Austal's website, in press releases, and in public filings made in Australia on the ASX.

84.    Austal's filings, press releases, and investor presentations that contained or discussed Austal's financial statements and results and the amount Austal's revenue and EBIT, and included Austal's fraudulent revenue and EBIT, at least the following:

Half-year 2014, ending December 31, 2013

    a.   Austal Half-Year Report, 31 December 2013, issued on February 27, 2014, attaching financial statements and containing discussion of financial results;

    b.   Austal H1 FY14 results presentation, issued on February 27, 2014, containing discussion of financial results; and

    c.   Austal press release "Austal Reports Strong Growth," issued on February 27, 2014, containing discussion of financial results.

The financial statements, report, results presentation, and press release falsely reported, among other things, that for half-year 2014, Austal's revenue was approximately AUD 507.6 million (approximately $450.3 million) and EBIT was AUD 18.7 million (approximately $16.5 million). For this period, Austal reported that AUSA had approximately AUD 419.8 million (approximately $372.5 million) in revenue and AUSA EBIT was AUD 26.9 million (approximately $23.9 million). This information came from the Management Accounts that

Perciavalle directed AUSA to provide to Austal. As explained in the chart below, *see infra* ¶ 89, Austal's results, were overstated by approximately $14.52 million for revenue and EBIT.

Fiscal year 2014, ending June 30, 2014

    a.  Austal 2014 Annual Report, issued on August 27, 2014, attaching financial statements and containing discussion of financial results;

    b.  Austal FY2014 results presentation, issued on August 27, 2014, containing discussion of financial results; and

    c.  Austal press release "Austal Delivers Record Revenue and Reduces Net Debt by 50%," issued on August 27, 2014, containing discussion of financial results.

The financial statements, report, results presentation, and press release falsely reported, among other things, that for fiscal year 2014, Austal's revenue was approximately AUD 1.12 billion (approximately $1.05 billion) and EBIT was AUD 55.6 million (approximately $52.3 million). For this period, AUSA reported approximately AUD 933.6 million (approximately $879.4 million) in revenue and EBIT was AUD 61.7 million (approximately $58.1 million). As explained in the chart below, *see infra* ¶ 89, Austal's results, were overstated by approximately $33.53 million for revenue and EBIT.

Half-year 2015, ending December 31, 2014

    a.  Austal 31 December 2014 Half-Year Report, issued on February 25, 2015, attaching financial statements and containing discussion of financial results;

    b.  Austal FY2015 H1 results presentation, issued on February 25, 2015, containing discussion of financial results; and

     c.  Austal press release "Austal Delivers Revenue and Earnings Growth; Returns to Dividends," issued on February 26, 2015, containing discussion of financial results.

The financial statements, report, results presentation, and press release falsely reported, among other things, that for half-year 2015, Austal's revenue was approximately AUD 680.2 million (approximately $554.8 million) and EBIT was AUD 45.0 million (approximately $36.7 million). For this period, AUSA reported approximately AUD 498.3 million in revenue (approximately $406.4 million) and EBIT was AUD 27.4 million (approximately $22.4 million). As explained in the chart below, *see infra* ¶ 89, Austal's results, were overstated by approximately $17.01 million for revenue and EBIT.

     Fiscal year 2015, ending June 30, 2015

     a.  Austal 2015 Annual Report, issued on August 26, 2015, attaching financial statements and containing discussion of financial results;

     b.  Austal FY2015 results presentation, issued on August 26, 2015, containing discussion of financial results; and

     c.  Austal press release "Austal Delivers Record Profit, Increases Dividend," issued on August 26, 2015, containing discussion of financial results.

The financial statements, report, results presentation, and press release falsely reported, among other things, that for fiscal year 2015, Austal's revenue was approximately AUD 1.41 billion approximately $1.08 billion) and EBIT was AUD 84.8 million (approximately $64.9 million). For this period, AUSA reported approximately AUD 1.12 billion in revenue (approximately $857.4 million) and EBIT was AUD 58.4 million (approximately $44.7 million). As explained in

the chart below, *see infra* ¶ 89, Austal's results, were overstated by approximately $14.15 million for revenue and EBIT.

Half-year 2016, ending December 31, 2015

    a.  Austal 31 December 2015 Half-Year Report, issued on February 23, 2016, attaching financial statements and containing discussion of financial results;

    b.  Austal FY2016 H1 results presentation, issued on February 23, 2016, containing discussion of financial results; and

    c.  Austal press release "Austal Delivers Strong Cashflow, Doubles Interim Dividend," issued on February 23, 2016, containing discussion of financial results.

The financial statements, report, results presentation, and press release falsely reported, among other things, that for half-year 2016, Austal's revenue was approximately AUD 747.4 million (approximately $544.7 million) and EBIT was AUD 29 million (approximately $21.1 million). For this period, AUSA reported approximately AUD 638.4 million in revenue (approximately $465.2 million) and EBIT was AUD 26.9 million (approximately $19.6 million). As explained in the chart below, *see infra* ¶ 89, Austal's results, were overstated by approximately $26.33 million for revenue and EBIT.

    85.    Defendants understood that the manipulated EACs directly impacted Austal's financial statements during the Relevant Period. Perciavalle and Runkel were directly involved with AUSA's Management Accounts sent to Austal. Thus, they knew, or were severely reckless in not knowing, that AUSA reported false revenue and EBIT (based on artificially low EACs) to Austal, and that in turn Austal used AUSA's false financial data to support Austal's financial statements. Adams knew, or was severally reckless in not knowing, that the false EACs would

ultimately impact Austal's financial statements. Adams admitted to the Material Manager that Austal's stockholders did not know that AUSA, and so Austal, were using artificially low EACs to calculate revenue.

**I.     The Manipulated EACs Were Much Lower than the EACs AUSA Submitted to the Navy.**

86.     Under Runkel's supervision, AUSA sent the Navy monthly CPRs, which included the Navy EACs. These Navy EACs reflected higher LCS EACs than the EACs that AUSA used to calculate its revenue and EBIT. Among other things, these CPRs supported AUSA's costs, progress, and timing of building the LCS ships. Thus, AUSA had an incentive to report more accurate EACs to the Navy in order to explain any delays in completion and to justify any attempt to obtain payments from the Navy in excess of the contract amount.

87.     As set forth in the chart below (all numbers below are approximate), comparing the Navy EACs to the LCS EACs that AUSA used to calculate revenue and profit and reported to Austal demonstrates that AUSA understated the LCS EACs by tens of millions of dollars by at least its half-year 2014:

|  | 12/31/13 HY14 | 6/30/14 FY14 | 12/31/14 HY15 | 6/30/15 FY15 | 12/31/15 HY16 |
|---|---|---|---|---|---|
| AUSA's Reported LCS EACs | $1.02 billion | $1.50 billion | $2 billion | $2.53 billion | $2.21 billion |
| Navy EACs | $1.05 billion | $1.56 billion | $2.10 billion | $2.62 billion | $2.36 billion |
| Difference | ($37.75 million) | ($58.18 million) | ($103.87 million) | ($96.40 million) | ($141.93 million) |

**J.      AUSA's False LCS EACs Allowed Austal to Meet or Beat Analyst Consensus Estimates for EBIT.**

88.      Using the manipulated LCS EACs resulted in Austal overstating revenue and profit for at least the half and annual year periods set out in the chart below, thus allowing it to generally meet or beat analyst consensus for EBIT, Austal's most important financial metric.

89.      If AUSA had used the Navy EACs, Austal would have missed, by wide margins, analyst consensus estimates for EBIT for its half-year 2014, fiscal year 2014, half-year 2015, and fiscal year 2015, as well as reported an EBIT loss for half-year 2016, as reflected in the below chart:

|                 | Austal's Reported EBIT | Analyst Consensus EBIT | Austal's EBIT if used the Navy EAC |
|-----------------|------------------------|------------------------|------------------------------------|
| Half-year 2014  | $22.81 million         | $20.67 million         | $8.29 million                      |
| Fiscal year 2014| $61.51 million         | $56.94 million         | $27.98 million                     |
| Half-year 2015  | $27.49 million         | $27.73 million         | $10.48 million                     |
| Fiscal year 2015| $56.04 million         | $54.93 million         | $41.89 million                     |
| Half-year 2016  | $21.13 million         | $23.32 million         | $(5.20) million                    |

90.      All numbers in the above chart are approximate and have been converted into US Dollars from AUD. Further, the analyst consensus EBIT and Austal's reported EBIT numbers listed in the above chart are from Refinitiv Institutional Brokers' Estimate System (I/B/E/S), and the Refinitiv I/B/E/S analysts made certain adjustments to Austal's reported EBIT numbers in order to make these figures comparable to the analyst consensus figures.

91.      While Austal's reported EBIT was approximately $240,000 less than the EBIT analyst consensus for the half-year ended December 31, 2014 (referred to as half-year 2015 in the chart above), this amount is marginal and analysts and the investing public understood that

27

Austal had met expectations for EBIT for that period. Austal announced these half-year 2015 results on February 25, 2015, and the closing price of Austal's Ordinary Shares stayed consistent around AUD 1.585 to 1.59 per share.

92.     As discussed below, because AUSA was ultimately forced to include some of the cost growth for the half-year ended December 31, 2015 (referred to as half-year 2016 in the chart above), Austal's reported EBIT was lower than the analyst consensus EBIT for that period. Using the Navy EACs for that period, however, would have generated a far larger miss and an EBIT loss.

93.     Overall, by meeting or exceeding analysts' EBIT consensus estimates, Austal's Ordinary Shares and ADRs increased dramatically in price. From the financial period ended December 31, 2013 (reported to the investing public on February 27, 2014) through the financial period ended June 30, 2015 (reported to the investing public on August 26, 2015), Austal's Ordinary Shares increased in value – going from approximately AUD 0.88 per share during late February 2014 to approximately AUD 2.40 per share by late November 2015.

94.     In addition, Austal's Ordinary Shares price and volume sometimes increased substantially after it prematurely recognized revenue and met or beat analyst consensus estimates for EBIT. For example, on August 26, 2015, on the ASX, Austal reported its fiscal year 2015 results for the period ending June 30, 2015, and the next day its Ordinary Shares increased from a closing price of AUD 1.87 to 1.97 a share and its daily volume went from nearly 800,000 to more than 2.5 million.

**K.     The Fraud Starts to Come to an End.**

95.     As construction of the LCS ships progressed, the false EACs began to catch up to AUSA. Indeed, by April 2015, the "challenge" that Perciavalle wanted to apply to LCS 6 was higher than the cost of materials estimated from that point forward to complete the ship. If

AUSA had applied the entire challenge, the EAC on LCS 6 would be lower than what AUSA had already spent on LCS 6. As such, AUSA had to recognize the EAC increase on LCS 6.

96.     By the end of 2015, as it was preparing its half-year 2016 financials, AUSA's Navy EACs had grown far beyond the manipulated LCS EACs (as reflected in the chart above). Because certain ships were now completed or nearly completed and AUSA had incurred costs to complete the ships, AUSA had to include these building costs in the EACs. In turn, this negatively impacted AUSA's, and thus Austal's, profit. In fact, on or about September 21, 2015, the former AUSA CFO emailed Austal a PowerPoint informing Austal that AUSA would likely miss its 2016 EBIT target.

97.     On December 10, 2015, Austal announced that its fiscal year 2016 earnings from AUSA would be lower than fiscal year 2015. In response to this announcement, Austal's Ordinary Share on the ASX fell by AUD 0.58, a drop of 25.4%.

98.     Further, by at least May 2016, Austal understood that committed costs on six LCS ships (even numbers 6 through 16) were already much higher than the EACs. Thus, because these costs were now committed not merely estimated costs, Austal had no choice but to include this cost growth in its LCS EACs.

99.     For several weeks in April through June 2016, Austal's CFO came to AUSA and worked with Perciavalle, Runkel, and other AUSA personnel to reset the LCS EACs. This process led to Austal's July 4, 2016 press release announcing that a "US$115 million (A$156 million) one off write back of work in progress (WIP) is required to recognize an increase in the cost of construction." The write back led to an EBIT loss of $89.6 million for Austal for fiscal year 2016. Austal's Ordinary Shares on the ASX dropped 8.26% following the announcement.

**L.       Defendants Engaged in Deceptive Acts.**

100.     As detailed above, Defendants used instrumentalities of interstate commerce in connection with the purchase or sale of Austal's securities. Defendants also engaged in deceptive acts to defraud investors by manipulating the LCS EACs, in order to prematurely and fraudulently recognize revenue for the periods listed above and allow Austal to meet or exceed analyst consensus estimates for EBIT.

101.     As detailed above, Perciavalle used devices, schemes or artifices to defraud in connection with the purchase or sale of Austal's securities and acted knowingly or with severe recklessness. Perciavalle committed numerous deceptive acts in furtherance of this scheme. Among other things, Perciavalle:

    a.  Manipulated EACs in response to pressure from Austal executives to meet AUSA's budgeted revenue and EBIT;

    b.  Directed AUSA personnel to falsify the EACs by, among other things: (i) applying management challenges to the LCS material EACs calculated by the Material Manager; and (ii) using either the bid LCS labor hours EACs or LCS labor hours EACs that were lower than the LCS labor hours EACs calculated by LCS personnel;

    c.  Concealed from the AUSA Board outside managers that Defendants were artificially lowering the EACs and that AUSA was applying phony management challenges to the LCS material EACs;

    d.  Ordered AUSA personnel to hide or delete specific references to management challenges in various AUSA documents, including the Executive Review meeting PowerPoints;

    e.  Hid the EAC manipulation from AUSA's auditors by not disclosing the fraud when asked about AUSA's EAC process, and purposely presenting the auditors with a JHSV example rather than an LCS example to explain the EAC process (because management challenges were not being applied to the JHSV EACs);

f.  Failed to use or instruct others to use the "latest available, reliable information" to calculate the EACs, even though he knew the EACs were objectively false;

g.  Generated false financial information or instructed others to provide false financial information that he knew (or was severely reckless in not knowing) AUSA would include in its financial statements that it reported to Austal. He also knew (or was severely reckless in not knowing) that Austal would report this false financial information to the investing public; and

h.   Provided higher EAC numbers to the Navy than those that were included in Austal's financials, which demonstrated that he knew the higher labor EACs submitted to the Navy were the better estimate.

102.  As detailed above, Runkel used devices, schemes or artifices to defraud in connection with the purchase or sale of Austal's securities and acted knowingly or with severe recklessness. Runkel committed numerous deceptive acts in furtherance of this scheme. Among other things, Runkel:

a.  Calculated the amount Defendants needed to manipulate the LCS EACs in order for AUSA to hit its budgeted revenue and EBIT, including analyzing various scenarios and the impact of including costs in the EACs on AUSA's revenue and EBIT;

b.  Used disposable sticky notes to direct others to input manipulated numbers in an attempt to conceal that Defendants were engaged in fraud;

c.  Executed instructions from Perciavalle and the former AUSA CFO to artificially and fraudulently lower the LCS EACs, including to apply phony management challenges to the LCS material EACs;

d.  Created a 90% Learning Curve for the LCS labor hours EACs, in an attempt to justify the manipulated LCS labor hours EACs;

e.  Prepared false EACs that were used to calculate AUSA's revenue and EBIT, including sending those to the AUSA controller;

f.  Hid the EAC manipulation from AUSA's auditors by not disclosing the fraud when asked about AUSA's EAC process, and purposely presenting the auditors

with a JHSV example rather than an LCS example to explain the EAC process (because management challenges were not being applied to the JHSV EACs);

g. Failed to use the "latest available, reliable information" or instructed others to not use the "latest available, reliable information" to calculate the EACs, even though he knew the EACs were objectively false; and

h. Generated false financial information or instructed others to provide false financial information that he knew (or was severely reckless in not knowing) AUSA would include in its financial statements that it reported to Austal. He also knew (or was severely reckless in not knowing) that Austal would report this false financial information to the investing public.

103.    As detailed above, Adams used devices, schemes or artifices to defraud in connection with the purchase or sale of Austal's securities and acted knowingly or with severe recklessness. Adams committed numerous deceptive acts in furtherance of this scheme. Among other things, Adams:

a. Used disposable sticky notes to direct others to input manipulated numbers in an attempt to conceal that Defendants were engaged in fraud;

b. Threatened the Material Manager to not discuss the management challenges with the Austal CFO if she wanted to keep her job;

c. Admitted to the Material Manager that Austal's stockholders did not know artificially low EACs were being used to calculate and report revenue;

d. Hid the EAC manipulation from AUSA's auditors by not disclosing the fraud when asked about AUSA's EAC process, purposely presenting the auditors with a JHSV example rather than an LCS example to explain the EAC process (because management challenges were not being applied to the JHSV EACs), and requiring the sign-off sheets to falsely document the manipulated EACs;

e. Falsely signed the LCS labor hours EAC sign-off sheet for the December 31, 2015 EACs, which documented the phony labor EACs that were used to calculate AUSA's half-year 2016 financials;

    f.    Conveyed instructions from Perciavalle and the former AUSA CFO to other AUSA personnel to artificially and fraudulently lower the LCS EACs, including to apply management challenges to the LCS material EACs;

    g.    Directed AUSA personnel to hide or delete specific references to management challenges in various AUSA documents, including the Executive Review meeting PowerPoints and the sign-off sheets;

    h.    Failed to use or instruct others to use the "latest available, reliable information" to calculate the EACs, even though he knew the EACs were objectively false; and

    i.    Generated false financial information or instructed others to provide false financial information that he knew (or was severely reckless in not knowing) AUSA would include in its financial statements that it reported to Austal. He also knew (or was severely reckless in not knowing) that Austal would report this false financial information to the investing public.

104.    The above referenced actions by Defendants were done with scienter and led to Austal reporting material misstated financial statements to the investing public.

**M.    Defendants Received Compensation Tied to Financial Measures.**

105.    Defendants received compensation during the Relevant Period tied to AUSA and Austal financial measures.

106.    First, Defendants received bonuses pursuant to Austal's Short Term Incentive ("STI") program. Perciavalle received $50,250 in STI for fiscal year 2013 tied solely to AUSA's EBIT, and received $80,000 in STI for fiscal year 2014 tied solely to AUSA's EBIT margin. Adams received $13,791 and Runkel received $13,520 in STI for fiscal year 2013, tied 80% to AUSA's EBIT and 20% to a department goal that directly contributed to AUSA's EBIT. Adams received at least $10,136 and Runkel received $9,779 in STI for fiscal year 2014, tied solely to AUSA's EBIT.

107.    Second, Perciavalle received performance rights under Austal's Long Term Incentive ("LTI") program, where each performance right converted at zero cost on a one-for-

one basis to Austal shares, subject to vesting and holding periods. The grant of LTI performance rights was at the discretion of Austal's board and vesting of performance rights was tied to two Austal performance measures: (1) total shareholder return, defined as capital growth in the value of Austal shares plus dividends paid; and (2) return on capital invested, defined as net operating profit after tax exclusive of abnormal items. Perciavalle received LTI performance right grants for fiscal years 2014 and 2015, which vested after between two and four years, based on meeting the target total shareholder return and return on capital investment measures. Perciavalle exercised his vested performance rights and sold these Austal shares.

**N.      Defendants Aided and Abetted Violations of Section 10(b).**

        **1.      AUSA and Austal Violated Section 10(b) and Rule 10b-5(a) and (c) of the Exchange Act and Defendants Aided and Abetted AUSA's and Austal's Violations.**

108.      AUSA and Austal, through Defendants, engaged in a deceptive scheme to artificially reduce the LCS EACs in order to report more revenue to investors for the periods at issue. As a result, AUSA and Austal violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

109.      Based on their titles and job functions, Defendants' knowledge is imputed to AUSA and Austal.

110.      As described above, AUSA and Austal used instrumentalities of interstate commerce in connection with the purchase or sale of Austal's securities.

111.      As detailed above, AUSA and Austal through the actions, knowledge, and conduct of Defendants used devices, schemes or artifices to defraud in connection with the purchase or sale of Austal's securities and acted knowingly or with severe recklessness.

112.      As detailed above, Defendants aided and abetted these violations by AUSA and Austal by knowingly (or with severe recklessness) providing substantial assistance to those

violations. Among other things, Defendants conducted the EAC manipulation that led to fraudulent revenue recognition and false financial statements.

### O. Austal Violated Section 10(b) and Rule 10b-5(b) of the Exchange Act and Defendants Aided and Abetted Those Violations.

113. Austal violated Section 10(b) and Rule 10b-5(b) of the Exchange Act by making untrue statements of a material fact (or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading) in the above referenced filings, investor presentations, and press releases.

114. Based on their titles and job functions, Defendants' knowledge is imputed to Austal.

115. As described above, Austal used instrumentalities of interstate commerce in connection with the purchase or sale of Austal's securities.

116. As detailed above, Austal, through the actions, knowledge, and conduct of Defendants, made misrepresentations of material fact, or omitted material fact, regarding its revenues and EBIT contained in the reports, presentations, and press releases listed above, in connection with the purchase or sale of Austal's securities.

117. Defendants' artificial reductions to the LCS EACs caused Austal to report materially false and misleading information to analysts and the investing public. As set forth above, if AUSA had instead used the Navy EACs, Austal would not have met or beat analyst consensus estimates for EBIT for its fiscal year 2014, half-year 2015, and fiscal year 2015, and would have had to report an EBIT loss for half-year 2016. Further, Austal would have missed the consensus estimates for EBIT by wide margins. In addition, during the time period Austal was making material misstatements and omissions, its Ordinary Shares' price was materially affected as it rose in value and during the time period that Austal started to disclose its fraud its stock

price was materially affected as it decreased in value. Lastly, reasonable investors would have wanted to know that Defendants were intentionally manipulating the revenue and EBIT number.

118.    As described above, Austal, through the actions, knowledge, and conduct of Defendants, acted knowingly or with severe recklessness.

119.    As detailed above, Defendants aided and abetted these violations by knowingly or recklessly providing substantial assistance to those violations. Among other things, Defendants conducted the EAC manipulation that led to Austal's fraudulent revenue recognition and false financial statements, investor presentations and press releases.

## V.    CLAIMS FOR RELIEF

### First Claim for Relief
**Fraud - Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Thereunder (15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a) and (c))**
(All Defendants)

120.    The SEC realleges and incorporates by reference in this claim for relief paragraphs 1 through 119 as if fully restated herein.

121.    Defendants, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly and severally recklessly: (a) employed devices, schemes, or artifices to defraud; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

122.    By engaging in the conduct described above, Defendants directly or indirectly violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) and (c).

**Second Claim for Relief**
**Fraud – Aiding and Abetting AUSA's Violations of Exchange Act Section 10(b) and Rules**
**10b-5(a) and (c) Thereunder (15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a) and (c))**
(Against All Defendants)

123.    The SEC realleges and incorporates by reference in this claim for relief

paragraphs 1 through 119 as if fully restated herein.

124.    As alleged above, AUSA violated Section 10(b) of the Exchange Act, 15 U.S.C. §

78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) and (c).

125.    During the Relevant Period, Defendants knowingly or severely recklessly

provided substantial assistance to AUSA in furtherance of their violations alleged above.

126.    By engaging in the conduct described above, Defendants aided and abetted and,

unless restrained and enjoined, will continue to aid and abet violations of Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5

(a) and (c).

**Third Claim for Relief**
**Fraud – Aiding and Abetting Austal's Violations of Exchange Act Section 10(b) and Rule**
**10b-5 Thereunder (15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b))**
(Against All Defendants)

127.    The SEC realleges and incorporates by reference in this claim for relief

paragraphs 1 through 119 as if fully restated herein.

128.    As alleged above, Austal violated Section 10(b) of the Exchange Act, 15 U.S.C. §

78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

129.    During the Relevant Period, Defendants knowingly or severely recklessly

provided substantial assistance to Austal in furtherance of their violations alleged above.

130.     By engaging in the conduct described above, Defendants aided and abetted and, unless restrained and enjoined, will continue to aid and abet Austal's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## VI.     PRAYER FOR RELIEF

WHEREFORE, the SEC seeks the following relief:

1.     Find that Defendants committed the violations alleged in this Complaint;

2.     Enter an injunction, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure and Eleventh Circuit case law, permanently enjoining Defendants and their agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with them, who receive actual notice of the Final Judgment by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder;

3.     Order Defendants to disgorge ill-gotten gains received during the period of violative conduct and pay prejudgment interest on such ill-gotten gains pursuant to Section 21(d)(5) and 21(d)(7) of the Exchange Act, 15 U.S.C. §§ 78u(d)(5) and (7);

4.     Order Defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3);

5.     Order that Defendants be permanently prohibited from acting as an officer or director of any public company pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2); and

6.     Grant such other and further relief as this Court may deem just and proper.

## VII.   JURY DEMAND

The SEC demands a trial by jury on all claims so triable.

Dated: March 31, 2023

Respectfully submitted,

By:  *s/ Sharan E. Lieberman*

Christopher E. Martin
Sharan E. Lieberman
U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294-1961
Telephone: 303-844-1106 (Martin)
           303-844-1036 (Lieberman)
           303-844-1000 (Main)

Email: martinc@sec.gov
       liebermans@sec.gov

*Attorneys for Plaintiff*
*U.S. Securities and Exchange Commission*